**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**INTERIOR ENTERPRISES, INC., Respondent.**

**No. 17083.**

United States Court of Appeals
Ninth Circuit.

Dec. 26, 1961.

Stuart Rothman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Allison W. Brown, Jr., and Solomon I. Hirsh, Attys., N.L.R.B., Washington, D. C., and Charles Henderson, Atty., N.L.R.B., Seattle, Wash., for petitioner.

Charles E. Cole, Fairbanks, Alaska, for respondent.

Before CHAMBERS, HAMLIN and KOELSCH, Circuit Judges.

HAMLIN, Circuit Judge.

The National Labor Relations Board, hereinafter called the Board, petitions this court in this proceeding for enforcement of an order of the Board issued against Interior Enterprises, Inc., respondent herein. Unfair labor practices were alleged to have occurred at Fairbanks, Alaska, where respondent is engaged in business as a private contract carrier by air. This court has jurisdiction pursuant to 29 U.S.C.A. § 160(e).

The respondent, in addition to denying that there were any unfair labor practices, contends that the Board did not have jurisdiction of the proceedings because respondent is not an "employer" as defined in section 2(2) of the National Labor Relations Act, 29 U.S.C.A. § 152(2), a pertinent portion of which reads as follows:

> "The term 'employer' * * * shall not include * * * any person subject to the Railway Labor Act * * *."

In the proceedings below the Board issued a complaint alleging that respondent had committed unfair labor practices affecting commerce within the meaning of sections 2(6) and (7) and 8(a) (1), (3), and (5) of the National Labor Relations Act, as amended, 29 U.S.C.A. §§ 152(6) and (7) and 158(a) (1), (3), and (5). At the conclusion of the hearing before a trial examiner respondent moved to dismiss for lack of jurisdiction on the ground that respondent was subject to the Railway Labor Act, 45 U.S.C.A. § 151 et seq., and hence was not an "employer" within the meaning of 29 U.S.C.A. § 152

(2), supra. The trial examiner concluded that respondent was not an "employer" under section 152(2) and recommended to the Board that the complaint be dismissed.

The Board disagreed with the recommendation of the trial examiner as to the dismissal of the proceeding for lack of jurisdiction, and remanded the case to the trial examiner. Thereafter, the trial examiner made findings of unfair labor practices by respondent. He made recommendations that respondent cease and desist therefrom and that it take certain affirmative action set out in the Trial Examiner's Supplemental Intermediate Report. In accordance with these findings and recommendations the Board issued the order for which it seeks enforcement herein.

Respondent's contention that it is subject to the Railway Labor Act (45 U.S. C.A. § 151 et seq.) and not to the National Labor Relations Act (29 U.S.C.A. § 151 et seq.) is based upon the following section of the Railway Labor Act, 45 U.S.C.A. § 181, the pertinent provisions of which read as follows:

"All of the provisions of sections 151, 152, and 154–163 of this title are extended to and shall cover every common carrier by air engaged in interstate or foreign commerce, and every carrier by air transporting mail for or under contract with the United States Government * * *."

In his first intermediate report and recommended order wherein he concluded that respondent was subject to the jurisdiction of the Railway Labor Act rather than to the National Labor Relations Act, the trial examiner set out in detail certain findings of fact as to respondent's activity. When the Board made its order reversing the recommendation of the trial examiner that the proceeding be dismissed it did not set aside his findings of fact pertaining to the activities of the respondent in transporting mail. It did, however, draw a different conclusion therefrom. In the course of this opinion we shall quote from the findings of fact of the trial examiner.

The inception of respondent's flying activities in Alaska and the Arctic region are described in the trial examiner's findings as follows:

"As a result of negotiations with representatives of Western Electric Company and a joint enterprise operating under the name of Puget Sound & Drake, herein called P. S. & D., the Respondent * * * undertook in March 1953 to furnish flying service on what became known as the DEW Line (Distant Early Warning, a defense project), between Barter Island and several other sites in the Arctic. In addition to carrying workmen and freight, the Respondent *transported mail between the DEW Line sites.* Thereafter, the Respondent continued under contract with Western Electric Company and P. S. & D. alternately. Western Electric was the prime contractor under contract with the United States Air Force; P. S. & D. was a subcontractor under that contract, and the Respondent's contract with the P. S. & D. was a sub-subcontract.

"By January 1, 1957, the Respondent had planes stationed at Point Barrow and Barter Island and, although its principal function was lateral support of the DEW Line, it did, to a limited extent, participate in vertical hauling from Fairbanks to the DEW Line. As of the latter date,[1] the respondent entered into a contract with P. S. & D. for the period of January 1 to February 15, 1957, and later into an identical contract for the period of February 16 to June 30, 1957, under the terms of which the respondent agreed to make available to P. S. & D. aircraft with

---

1. Apparently at about this time Federal Electric Corporation succeeded Western Electric as the prime contractor. [Re-  numbered footnote belongs to the quotation.]

crews, and P. S. & D. agreed to pay the respondent on a time or mileage basis according to a schedule furnished.

"On June 19, 1957, the Respondent made a contract direct with the Federal Electric Corporation, covering the term from July 1, 1957, to June 30, 1958 * * *. Federal Electric was a prime contractor with the United States Air Force for operation and maintenance of the DEW Line, and the Respondent became, by its contract with Federal Electric, a subcontractor. The subcontract was made subject to the approval of the United States Air Force Administration Contracting Officer and was stated not to be binding until so approved. Approval actually was given in October 1957, but the Respondent operated under the contract as made with Federal Electric after July 1, 1957 and the Air Force tacitly recognized it by direct delivery to the Respondent of some of the mail required to be carried by the Respondent under the contract." [Emphasis added.]

The respondent is subject to the Railway Labor Act and not to the National Labor Relations Act if it is a "carrier by air transporting mail for or under contract with the United States Government." 45 U.S.C.A. § 181.

Respondent's subcontract contains, inter alia, the following clauses:

"1. GENERAL SCOPE OF AGREEMENT—In connection with the air transportation services for the logistic support of the DEW Line System, * * * the Carrier will perform the work and services necessary for the performance thereof, all in accordance with the applicable conditions and specifications contained in the Prime Contract between the Government and FEC [Federal Electric Corporation] * * *.

"5. (b) After Government approval of this subcontract, the Carrier, INTERIOR, is not authorized to expend or obligate in furtherance of its performance hereunder more than One Million, Two Hundred Thousand Dollars ($1,200,000) during the period of the performance of this subcontract, without the written consent of FEC.

"7. (b) The Carrier shall be paid upon the submission of properly certified invoices or vouchers in such form and detail as may be required by the United States Department of the Air Force, Air Materiel Command, for the purpose of obtaining current reimbursement payments, the price stipulated therein for services rendered * * * after certification by a United States Government Audit Agency.

"8. DEFINITIONS—As used throughout this Subcontract, the following terms shall have the meanings set forth below:

* * * * * *

"Airlift is the transportation by aircraft * * * of personnel, cargo, and mail other than for the general public.

"Vertical Airlift consists of northbound flights from designated rearward terminal point to designated DEW Line Sites * * * and return * * *.

"Lateral Airlift consists of flights along the DEW Line generally in an Easterly-Westerly or reverse direction.

"12. USE OF AIRCRAFT—(a) The aircraft shall be employed principally for the transportation of personnel, baggage, Contractor and Government furnished materials and equipment and mail other than mail for the general public, to, from, and between stations and locations as indicated on Schedule "A" [19 DEW Line Sites] * * *.

"26. STATION SERVICES—

* * * * * *

"(f) At Fairbanks International Airport, the Carrier agrees to fur-

nish, at no cost to the Contractor, all facilities and services for the handling of passengers, cargo, mail, and other traffic * * *".

In Schedule "A" of the contract there is set out an estimate of the weekly airlift supplies to the 19 DEW Line sites, including among other items the following:

|  | First Quarter | Second, Third and Fourth Quarters |
|---|---|---|
| Mail | 903# | 404# |

The details of the actual operations of respondent's mail carrying activities are set forth in the trial examiner's findings as follows:

"The contract specifies that it does not cover the airlift of mail for the general public, but *only a part of the mail carried is to or from personnel of Federal Electric itself or persons having their mail addressed in care of Federal Electric. A substantial portion of it is for servicemen located at one of the DEW Line sites, including personnel on ships at any one of such points.* Such mail embraces communications between servicemen and their friends and relatives, and between servicemen and mail order houses. Such mail, if originating in the States, goes through United States Post Office channels to APO 903 in Seattle, Washington, and thence to Fairbanks either by a certificated air carrier in the case of air mail, or, in the case of ordinary mail, by barge to Valdez and by freight carriers from there to Fairbanks. *The mail carried in the latter manner is paid for by the military.* * * * *At Fairbanks, the military* has its own postal crew staffed by Army, Navy, and Air Force personnel at Ladd Air Force Base near Fairbanks, and it *receives mail from the States and prepares it in postal pouches or sacks for the airlift to the various DEW Line sites. Sealed bags of registered mail, in addition to regular mail bags, are among* those carried. Although records of the Air Force show delivery of such mail to Federal Electric, in practice *military trucks sometimes carry it direct to the Respondent's planes at the Fairbanks International Airport.* This was especially the case in 1957 when the volume of mail was heavy. At other times, the mail at Ladd Air Force Base has been delivered to Federal Electric trucks for delivery to the Respondent at International Airport in Fairbanks. *When mail bags carrying mail to military personnel at DEW Line sites are delivered to those sites by the Respondent, the military resumes responsibility for delivery of the mail to its personnel.*

"Normally neither the Post Office Department nor the military postal arm would make a contract for the carrying of mail by air except with a certificated air line, but certificated air carriers go to few of the DEW Line sites, and the only practical way to take mail to the sites not served by certificated carriers is either by military planes or by the Respondent's planes and, as Federal Electric, by its contract with the Air Force and the Respondent, by its subcontract, are required to make trips there frequently, the Air Force uses them as the most expeditious means of getting mail to those sites. Furthermore, this practice avoids extra costs of carrying mail, because cargo has to be taken to the same sites anyway and the mail can be carried on the same planes as the cargo cheaper than it can by a flight undertaken for mail only." [Emphasis added.]

We think that the only reasonable conclusion to be drawn from the above findings is that the respondent is a carrier by air transporting mail *for* the United States Government. As such, the respondent is covered by the Railway Labor Act and is not an "employer" within the meaning of the National Labor Relations Act. Thus, the Board has no juris-

diction to enter an order against the respondent.

Under our view that the respondent was not an employer subject to the jurisdiction of the Board, it is unnecessary for us to consider whether or not respondent was guilty of unfair labor practices.

The petition of the Board for enforcement of its order is denied.